**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LACHARA HILL,<br><br>        Plaintiff,<br><br>-against-<br><br>NORTHSIDE CENTER FOR CHILD DEVELOPMENT, INC.,<br><br>        Defendant. | Case No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Dr. LaChara Hill ("Plaintiff" or "Dr. Hill"), by and through her attorneys, Mesidor PLLC, brings this action against Northside Center for Child Development, Inc. ("Defendant" or "Northside"), and alleges upon knowledge as to herself and her own actions and upon information and belief as to all other matters as follows:

## NATURE OF CLAIMS

1.      Dr. Hill, a seasoned Human Resources professional, devoted her career to strengthening workplaces, upholding ethical standards, and protecting the employees she served. When Northside Center for Child Development, Inc. hired her as Director of Human Resources in February 2023, she excelled. Dr Hill quickly earned the trust of staff and leadership alike through integrity, diligence, and a record of flawless compliance.

2.      When a new CEO, Vikki Pryor, took power in July 2024, Dr. Hill was thrust into a crisis she simply could not ignore. Within weeks, Dr. Hill uncovered alarming misconduct at the highest levels of the organization: unlawful data manipulation, falsified reports to Medicaid, confidential employee financial information sent to a personal Gmail account, and sweeping alterations to departmental submissions intended for Northside's Board.

3.    Committed to upholding an ethical workplace, Dr. Hill reported Pryor's fraudulent and illegal practices to multiple Board members in August and September 2024, and again in February 2025. Her disclosures prompted a Board site visit and ultimately a formal investigation. Instead of addressing the misconduct, Northside retaliated against Dr. Hill for her whistleblower activity.

4.    On April 21, 2025, Dr. Hill began approved FMLA leave for medically necessary surgery for a torn lumbar disc.

5.    One day later, still recovering, Pryor called Dr. Hill and demanded she work. Despite Dr. Hill's protected medical leave, Pryor and her subordinates repeatedly contacted her with work demands and threatened that if she did not return early, the organization would "cease operations" and her job would be gone. Fearing for both the security of her livelihood and the employees who depended on her, Dr. Hill returned nearly eight weeks prematurely, still healing, still in pain.

6.    The punishment for her integrity did not stop. Northside delayed Dr. Hill from receiving a merit-based raise previously approved, blocked her from accessing her own personnel file, refused her the cost-of-living increase granted to every other employee, imposed needless and punitive restrictions on her medical accommodation, and created conditions designed to break her spirit.

7.    On July 15, 2025—eight days after she returned from coerced early leave, and just one week after she raised further concerns with the Board's investigator—Northside terminated her employment for pretextual reasons.

8.    Dr. Hill seeks declaratory relief, compensatory damages, punitive damages, back pay, front pay, and attorneys' fees and costs.

9.      Dr. LaChara Hill ("Dr. Hill"), by and through her undersigned counsel, alleges violations of the Family Medical Leave Act, 29 U.S.C. § 2615 *et seq.* ("FMLA"); New York Labor Law § 740 ("NYLL § 740"); New York Not-for-Profit Corporation Law § 715-b ("N-PCL § 715-b"); and the New York City Human Rights Law, New York City Administrative Code § 8-107 *et seq.* ("NYCHRL").

**PARTIES**

*Plaintiff*

10.      Dr. Hill joined Northside Center for Child Development, Inc. in February 2023 as Director of Human Resources. She held this position until Northside terminated her employment on July 15, 2025.

11.      Dr. Hill resides in Middletown, New York.

12.      Throughout her employment with Northside, Dr. Hill worked primarily within the Southern District of New York.

*Defendant*

13.      Northside Center for Child Development, Inc. is a not-for-profit corporation organized and existing under the laws of the State of New York.

14.      Northside maintains its principal place of business at 1475 Park Avenue, New York, New York 10029, within the Southern District of New York.

15.      At all times relevant, Defendant employed more than fifty employees. At the time of her FMLA leave, Plaintiff had worked for Defendant for more than twelve months, satisfying the statutory threshold for coverage under the Family Medical Leave Act.

16.      From February 2023 until July 15, 2025, Northside served as Dr. Hill's employer within the meaning of all applicable federal, state, and local employment laws.

**JURISDICTION AND VENUE**

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts federal law claims under the Family Medical Leave Act, 29 U.S.C. § 2615.

18.     This Court has supplemental jurisdiction over Plaintiff's claims under New York Labor Law § 740, New York Not-for-Profit Corporation Law § 715-b, and the NYCHRL, pursuant to 28 U.S.C. § 1367.

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District, Northside maintains its principal place of business in this District, and Dr. Hill worked in this District.

**FACTUAL ALLEGATIONS**

**Dr. Hill's Hiring and Exemplary Performance**

20.     Dr. Hill joined Northside Center for Child Development, Inc. in February 2023 as Director of Human Resources. Northside entrusted her with critical, organization-wide responsibilities, and she quickly proved herself as a highly competent and valued professional.

21.     Under the leadership of then-CEO Dr. Thelma Dye, Dr. Hill excelled in her role, successfully executing her responsibilities without issue. She maintained all regulatory compliance, reduced legal expenses from $60,000-$90,000 monthly to $30,000 annually, and passed all compliance audits without deficiency. Dr. Hill resolved employee relations cases faster than her predecessors had done and established efficient HR processes across the organization.

22.     Dr. Hill's contributions to Northside proved so significant that Dr. Dye approved a substantial 15% salary increase in recognition of her performance. This increase consisted of a 10% merit-based raise and a 5% cost-of-living adjustment (COLA). Dr. Dye personally signed the

4

Personnel Action Form (PAF) memorializing this increase on June 30, 2024, her final day as CEO, and called Dr. Hill to confirm she had delivered it directly to CFO Sharon Fraser.

23.     Upon Dr. Hill's return from approved paid time off, CFO Fraser confirmed receipt of the PAF, stating, "Doc, I have your form along with a few others in my safe; don't worry."

### Vikki Pryor's Arrival and Pattern of Misconduct

24.     In July 2024, Vikki Pryor succeeded Dr. Dye as CEO of Northside. Almost immediately after Pryor assumed leadership, Dr. Hill discovered that Pryor engaged in serious misconduct that violated Northside policy, ethical norms, and the law.

25.     In the same month she started as CEO, Pryor called Dr. Hill's personal cell phone on a Sunday and explicitly directed Dr. Hill to send highly confidential personnel data about Northside's employees to Pryor's personal Gmail account. During this call, Pryor stated, "I don't trust Senol; I know he's watching," referring to Senol Arabaci, Northside's IT Director, who had served the organization faithfully for nearly thirty years without a single disciplinary action.

26.     Dr. Hill also noticed and learned that Pryor systematically altered department data in Board packets. Multiple senior directors, including Paula Magnus, Sherrifa Bailey, Debra Carroll, and Carolina Laise-Chong, reported to Dr. Hill that Pryor changed their submitted data after they provided it to her. Pryor grossly overinflated basic statistics, such as Northside's gross revenue, the number of patients Northside served, and the number of trainings conducted by Dr. Hill, in her reports to the Board.

27.     Pryor falsely reported the number of people treated by Northside to Medicaid, creating potential liability for fraudulent claims. She presented fabricated data to both the Board and potentially to state and federal funding agencies.

28.    Pryor also hired her personal friend, Arlene Bascom, as a consultant at $150 per hour for up to 20 hours per week, bypassing normal HR and procurement procedures entirely. The contract required written approval for hours exceeding 20 per week, yet no such documentation existed. Ms. Bascom earned over $158,000 in just seven months—exceeding the CFO's salary.

29.    Most disturbingly, Pryor terminated Assistant Director of Finance Jessica Burckhardt citing "budget constraints," then immediately replaced her with Ms. Bascom at triple the cost. When Dr. Hill later showed the contract to Board Treasurer Martin Maleska, he expressed visible shock and stated he had "never seen such a contractor contract at Northside."

### Dr. Hill's Whistleblowing Activities

30.    In August 2024, Dr. Hill personally called Board Member Martin Maleska on a Sunday afternoon to report urgent concerns about Pryor's misconduct. Dr. Hill had spoken with Dr. Hazel Guzman (Chief Program Officer) and Senol Arabaci (Director of IT), who expressed identical frustrations and alarm regarding Pryor's disregard for ethics, sharing of confidential material, and manipulation of organizational data.

31.    Maleska assured Dr. Hill he would bring these matters to Board Chair Michael Goldstein. Within approximately one to two weeks, both Goldstein and Maleska visited Northside in person to meet privately with Pryor. That same morning, Pryor postponed a meeting with Dr. Hill, stating that she needed to prepare for the Board members' visit.

32.    Following the Board members' meeting with Pryor, Pryor claimed to the Board that it was Dr. Hill's "mistake" that caused employee financials to be sent to Pryor's Gmail, not Pryor's express direction. This claim was patently false, as Dr. Hill did not even have knowledge of Pryor's personal email address before Pryor shared it with her during the Sunday phone call in July 2024.

33.    Dr. Hill provided both versions of the altered Board packets to investigator Naveen Kabir, illustrating the edits Pryor made after departmental leaders submitted their data. Multiple colleagues, including Paula Magnus and Sherrifa Bailey, called Dr. Hill to express gratitude for standing up for the truth after witnessing Pryor's data manipulation.

34.    Despite the complaints to the Board, Pryor's behavior did not change. She continued to falsify numbers and information relating to the clinic.

35.    In light of this ongoing misconduct and concern about potential liability to Northside, Dr. Hill once more met with Board Treasurer Maleska in February 2025 to complain about Pryor's violations of policy and law. Maleska informed Dr. Hill that he would speak with the new Board Chairman, which led to an investigation into Pryor in April 2025.

36.    The Board hired investigator Naveen Kabir to conduct the investigation. Dr. Hill cooperated fully with the investigation.

### Pryor's Immediate Retaliation Against Complainants

37.    Pryor took prompt retaliatory actions against the employees who complained about her misconduct.

38.    In October 2024, Pryor attempted to terminate Arabaci, who was saved only by the fact that his employment contract precluded termination except for cause. Nevertheless, Pryor removed Arabaci from performing any actual work for Northside and replaced him with her son-in-law, Robert Brissett, who reported directly to her in violation of Northside policy.

39.    With respect to Dr. Guzman, Pryor made her employment so unbearable that Dr. Guzman was forced to take mental health leave. Dr. Hill witnessed this hostility firsthand when Pryor humiliated both Dr. Guzman and Dr. Hill in front of CFO Sharon Fraser by forcing them to participate in a degrading "I Am Somebody" chant, mocking a positive affirmation exercise.

7

40.    Shortly after Dr. Guzman went on medical leave, she left Northside's employ. Board Member Maleska himself later asked Dr. Hill, "What happened with Hazel's claim, she had a good case."

41.    Pryor also began giving Dr. Hill substantial difficulty in obtaining the salary increase previously approved by Dr. Dye. Despite Dr. Hill's repeated requests to view the signed PAF in her personnel file, Pryor and CFO Fraser refused access. In November 2024, during a meeting with both Pryor and Fraser, Pryor asked Fraser to retrieve the PAF. Fraser returned with a folder she claimed contained the document, but she never actually presented it to Dr. Hill.

<strong><u>FMLA Leave and Unlawful Interference</u></strong>

42.    On April 21, 2025, Dr. Hill began preapproved FMLA leave for medically necessary surgery for a torn lumbar disc. During this period, Dr. Hill also experienced homoglobin complications, requiring multiple blood transfusions and further contributing to her need for medical leave. Northside approved her leave through July 7, 2025, covering the required 12-week recovery period.

43.    However, on April 22, 2025—the day after Dr. Hill underwent surgery—Pryor called her, yelling at her and commanding her to perform work on behalf of Northside. This conduct persisted over Dr. Hill's supposed leave period, as both Pryor and other employees at Northside, acting at Pryor's direction, repeatedly contacted Dr. Hill for work tasks.

44.    Pryor explicitly threatened Dr. Hill, insisting that if Dr. Hill did not return to work well before the completion of her federally protected leave, Northside would cease operations and Dr. Hill would thereby be out of a job.

45.    Left with no other choice, Dr. Hill returned to work on May 13, 2025—roughly eight weeks before her leave was scheduled to end.

46.    As Dr. Hill was far from fully recovered, she was medically incapable of commuting to the office. Accordingly, Dr. Hill requested an accommodation to work from home, which she supported with appropriate medical documentation.

47.    Although Dr. Hill went back to work early solely for the benefit of Northside, she met significant pushback on her accommodation request from Pryor, who claimed that it constituted an "undue burden" for Northside to permit Dr. Hill to work from home. Pryor refused to provide the required written explanation or otherwise demonstrate how the accommodation created undue hardship.

48.    In fact, Pryor bullied one of Dr. Hill's subordinates into turning over Dr. Hill's entire medical file to her, in an evident attempt to find some way to deny Dr. Hill's reasonable request.

49.    While the accommodation was ultimately approved, Pryor nonetheless imposed onerous restrictions on Dr. Hill. Pryor excluded Dr. Hill from executive meetings and essential HR functions she could perform remotely. Most illogically, Pryor directed Dr. Hill to cancel all her remote meetings and reschedule them to take place at a time when Dr. Hill was back in the office, demonstrating that Pryor had no real interest in accommodating Dr. Hill.

50.    Moreover, Pryor informed Dr. Hill that she would not receive a cost-of-living increase to her salary, which was given to every other employee of Northside who had not assisted in the investigation of Pryor.

**Retaliation Escalates**

51.    On June 2, 2025, Dr. Hill emailed the Board's HR Committee, Board Chair, and Counsel to formally request clarification regarding the missing PAF. Dr. Hill explained that despite multiple requests over nearly a year, the June 30, 2024, PAF signed by Dr. Dye remained absent from her personnel file.

52.     In her email, Dr. Hill explained that upon her hire, she and Dr. Dye mutually agreed that after one year of service, based on her performance and contributions, her salary would be revisited with a potential 15% increase. Dr. Dye advised her of the 10% merit increase in February 2024, with implementation delayed until the budget stabilized, but retroactive to February. Dr. Dye also indicated Dr. Hill would receive a 5% COLA increase effective July 1, 2024.

53.     Dr. Hill recounted that Dr. Dye called her personally while Dr. Hill was on approved time off to confirm she had completed and submitted the PAF documenting the 10% increase and had given it directly to Sharon Fraser. Upon Dr. Hill's return, Fraser confirmed she had the form, stating, "Doc, I have your form along with a few others in my safe; don't worry."

54.     During a meeting with both Fraser and Pryor to discuss the PAF, Pryor asked Fraser to retrieve it. Fraser returned with a folder she claimed contained the document, but never actually presented it. When Dr. Hill offered to reach out to Dr. Dye for clarification, Pryor declined and stated they could resolve the issue internally.

55.     After significant effort, Dr. Hill eventually received her 10% merit increase in July 2024, but the raise was not retroactive to March 2024, and she did not receive her 5% COLA increase.

56.     Pryor claimed this was due to Dr. Hill's "misunderstanding of compensation." During the June 2, 2025 telephone call, Pryor told Dr. Hill she was being denied access to the PAF due to "confidentiality" and informed Dr. Hill she had no legal right to view documents pertaining to her compensation history—not to copy, not to record, simply to view.

57.     Dr. Hill concluded her June 2, 2025, email by stating: "I am raising this concern not only because I believe I am being denied access to information critical to my employment and

financial planning, but also because the cumulative handling of this matter increasingly feels retaliatory and discriminatory in nature."

58. The stress and anxiety caused by this ongoing retaliation culminated in a serious car accident on June 11, 2025. Dr. Hill attributes this accident directly to workplace stress caused by Pryor's harassment and retaliation.

59. On June 17, 2025, after Dr. Hill renewed her request for remote work because she remained unable to travel, Pryor falsely asserted that Dr. Hill was not following her requirements for remote work. Pryor claimed Dr. Hill's calendar did not reflect where Dr. Hill was spending her time.

60. When Dr. Hill responded that this was inaccurate, as Dr. Hill's calendar visibly displayed the time, attendees, and subject matter of all her meetings, Dr. Hill suggested that if remote work was not acceptable to Northside, she was more than happy to complete her FMLA leave, which Northside had refused to respect.

61. Pryor reluctantly approved Dr. Hill's remote work, claiming once more that it was somehow an undue burden on the company.

**Unlawful Termination**

62. On July 7, 2025, the day her FMLA leave was originally scheduled to end, Dr. Hill returned to in-person work.

63. The next day, July 8, 2025, Dr. Hill emailed investigator Kabir, raising concerns that other employees had shared with her about the still ongoing investigation, in addition to her own concerns about investigation integrity.

64. One week later, on July 15, 2025, Northside terminated Dr. Hill's employment for pretextual reasons.

11

65.     The close temporal proximity between Dr. Hill's protected activities—her whistleblowing complaints, her June 2, 2025 email to the Board, her accommodation requests, her return from leave which Northside continuously interfered with, and her July 8, 2025 email to the investigator—and her termination on July 15, 2025 demonstrates that Northside terminated Dr. Hill in retaliation for engaging in protected activities.

65.     The spurious reasons offered by Northside for Dr. Hill's termination constitute pretext for unlawful retaliation. Northside's termination decision was motivated by retaliatory animus against Dr. Hill for reporting illegal conduct, cooperating with the investigation, exercising her FMLA rights, and requesting reasonable disability accommodations.

### Dr. Hill's Damages

66.     As a direct and proximate result of Northside's unlawful conduct, Dr. Hill has suffered and continues to suffer severe emotional distress. She experiences daily sadness, hopelessness, and emptiness. She suffers from persistent anxiety, racing heart, and difficulty breathing. Dr. Hill experiences nightmares and severe sleep disturbance. She has suffered weight fluctuation, tension headaches, and stomach issues.

67.     Dr. Hill has incurred significant medical expenses for therapy sessions, doctor visits, and prescription medications. She requires ongoing treatment for the psychological harm Northside caused.

68.     Dr. Hill has lost wages, employment benefits, retirement contributions, and professional opportunities. Her professional reputation has suffered damage. The June 11, 2025, car accident, which Dr. Hill attributes directly to workplace stress, caused additional physical and financial harm.

**FIRST CAUSE OF ACTION**
**FMLA INTERFERENCE**

12

69.     Dr. Hill hereby repeats, reiterates, and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

70.     The FMLA provides that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

71.     At all times relevant, Dr. Hill was an eligible employee under the FMLA. She had been employed by Northside for more than twelve months, and Northside employed more than fifty employees, constituting a covered employer under the FMLA.

72.     Dr. Hill had a qualifying serious health condition (torn lumbar disc) requiring medically necessary surgery and a minimum twelve-week recovery period. Northside approved her FMLA leave from April 21, 2025, through July 7, 2025.

73.     Northside interfered with Dr. Hill's FMLA rights by calling her the day after surgery and demanding work, repeatedly contacting her during leave and threatening job loss, and coercing her early return on May 13, 2025—nearly eight weeks before her leave was scheduled to end.

74.     As a direct and proximate result of Northside's unlawful conduct, Dr. Hill has emotional distress requiring medical treatment; physical manifestations of stress including a car accident on June 11, 2025; and professional reputation harm.

75.     Northside's unlawful actions constitute willful, intentional, and reckless violations of the FMLA.

76.     Dr. Hill requests relief as hereinafter described.

**SECOND CAUSE OF ACTION**
**FMLA RETALIATION**

13

77.     Dr. Hill hereby repeats, reiterates, and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

78.     The FMLA prohibits employers from discriminating or retaliating against employees for exercising FMLA rights. 29 U.S.C. § 2615(a)(2).

79.     At all times relevant, Dr. Hill was an eligible employee under the FMLA. She had been employed by Northside for more than twelve months, and Northside employed more than fifty employees, constituting a covered employer under the FMLA.

80.     Dr. Hill had a qualifying serious health condition requiring medically necessary surgery and a minimum twelve-week recovery period. Northside approved her FMLA leave from April 21, 2025, through July 7, 2025.

81.     Northside retaliated against Dr. Hill by subjecting her to adverse treatment during and after her FMLA leave, denying proper accommodations, withholding her salary increase, excluding her from meetings and essential functions, and terminating her employment on July 15, 2025, shortly after her FMLA leave ended.

82.     But for Dr. Hill's exercise of FMLA rights, Northside would not have terminated her employment.

83.     As a direct and proximate result of Northside's unlawful conduct, Dr. Hill has suffered and continues to suffer economic losses including lost wages, benefits, and denied salary increases; emotional distress requiring medical treatment; physical manifestations of stress including a car accident on June 11, 2025; and professional reputation harm.

84.     Northside's unlawful actions constitute willful, intentional, and reckless violations of the FMLA.

85.     Dr. Hill requests relief as hereinafter described.

14

**THIRD CAUSE OF ACTION**
**FOR RETALIATION UNDER NEW YORK LABOR LAW § 740**

86.    Dr. Hill hereby repeats, reiterates, and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

87.    New York Labor Law § 740 protects employees who disclose or threaten to disclose to a supervisor or public body an activity, policy, or practice of the employer that the employee reasonably believes violates a law, rule, or regulation. The statute also protects employees who object to or refuse to participate in such activities.

88.    Dr. Hill reasonably believed that Northside and CEO Pryor engaged in activities that violated law, including: directing Dr. Hill to send confidential personnel data to Pryor's personal Gmail account, violating employee privacy and data protection laws; systematically altering department-submitted data in Board packets, constituting fraud; falsifying revenue, patient count, and training statistics; making false reports to Medicaid, constituting Medicaid fraud; violating not-for-profit governance requirements. These violations present substantial danger to the organization and public, as Medicaid fraud affects public health programs.

89.    Dr. Hill disclosed these violations to her employer. She reported to Board of Directors members Goldstein, Maleska, and Scheinfeld in August 2024, February 2025, and June 2025. Dr. Hill cooperated with the Board's formal investigation led by Naveen Kabir. She engaged in this protected activity in August 2024, February 2025, June 2025, and July 2025.

90.    Northside retaliated against Dr. Hill by denying her approved salary increase, subjecting her to hostile treatment, interfering with her FMLA leave, excluding her from meetings, and terminating her employment on July 15, 2025. The temporal proximity—termination one week after her July 8 email to the investigator—and the pretextual nature of the stated reasons establish causation.

91.    Northside's conduct was willful and wanton.

92.    As a direct and proximate result of Northside's retaliatory conduct in violation of Labor Law § 740, Dr. Hill has suffered and will continue to suffer considerable injury, including lost wages, benefits, and denied salary increases; emotional distress requiring medical treatment; physical manifestations of stress including a car accident on June 11, 2025; and professional reputation harm.

93.    Dr. Hill requests relief as hereinafter described.

**FOURTH CAUSE OF ACTION**
**FOR RETALIATION UNDER NEW YORK NOT-FOR-PROFIT CORPORATION LAW**
**§ 715-b**

94.    Dr. Hill hereby repeats, reiterates, and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

95.    New York Not-for-Profit Corporation Law § 715-b protects employees of not-for-profit corporations who, in good faith, report violations or suspected violations of law to appropriate authorities. The statute provides that no not-for-profit corporation shall take any retaliatory action against an employee because such employee does any of the following: (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or of another employer, with whom there is a business relationship, that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud; (b) provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation; or (c) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation.

16

96.    Northside Center for Child Development, Inc. is a not-for-profit corporation organized and existing under the laws of the State of New York. Dr. Hill was an employee of this not-for-profit corporation from February 2023 until her termination on July 15, 2025.

97.    Dr. Hill, in good faith, reported violations and suspected violations of law to appropriate authorities for a not-for-profit corporation. She reported directly to Northside's Board of Directors, the governing body that constitutes the appropriate authority under § 715-b. The violations Dr. Hill reported included: directing confidential personnel data to personal email accounts in violation of HIPAA and data protection laws; systematically altering department-submitted data in Board packets, constituting fraud; falsifying revenue, patient count, and training statistics; making false reports to Medicaid, constituting Medicaid fraud; improperly hiring consultants while bypassing procurement procedures in violation of not-for-profit governance requirements; and breaching confidentiality obligations.

98.    Dr. Hill acted in good faith, reasonably believing these activities violated law and endangered the organization. She made direct disclosures to Board members Goldstein and Maleska in August 2024, to Board Treasurer Maleska in February 2025, to Board Chair Scheinfeld and the HR Committee in June 2025, and continued reporting through July 2025. Dr. Hill cooperated with the Board's formal investigation led by Naveen Kabir, providing recordings and documentary evidence to support her good-faith reports.

99.    Northside retaliated against Dr. Hill by denying her approved salary increase, refusing her access to her personnel file, excluding her from meetings and essential HR functions, imposing onerous restrictions on her disability accommodation, interfering with her FMLA leave, and terminating her employment on July 15, 2025. Dr. Hill's termination occurred just one week

17

after her July 8, 2025 email to the investigator raising concerns about the investigation process—her most recent protected disclosure.

100. The temporal proximity between Dr. Hill's protected disclosures and the adverse actions establishes causation. The pretextual nature of the stated reasons for termination further demonstrates that Northside terminated Dr. Hill because she engaged in protected whistleblowing activity under § 715-b.

101. Northside acted in a willful and wanton manner and in callous disregard for Dr. Hill's legally protected rights under § 715-b.

102. As a direct and proximate result of Northside's retaliatory conduct in violation of Not-for-Profit Corporation Law § 715-b, Dr. Hill has suffered and will continue to suffer considerable injury, including but not limited to loss of substantial past and future salary and income, mental anguish, emotional distress, humiliation, and other compensable damages.

103. Dr. Hill requests relief as hereinafter described.

**FIFTH CAUSE OF ACTION**

**RETALIATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW**

104. Dr. Hill hereby repeats, reiterates, and re-alleges each and every allegation contained in each of the preceding paragraphs as if fully set forth herein.

105. The NYCHRL prohibits employers from retaliating against employees who request a reasonable accommodation for a disability.

106. As described herein, Dr. Hill requested a reasonable accommodation for her disability on or about May 13, 2025.

107. After Dr. Hill requested a reasonable accommodation, Northside retaliated against her. Pryor denied Dr. Hill the approved salary increase. Pryor refused Dr. Hill access to her

18

personnel file. Northside denied Dr. Hill cost-of-living increases given to other employees. Northside excluded Dr. Hill from meetings. Northside terminated her employment on July 15, 2025, about two months after she first requested a reasonable accommodation.

108. The close temporal proximity between Dr. Hill's protected activities and the adverse actions establishes causation.

109. Such retaliatory treatment would dissuade a reasonable employee from requesting a reasonable accommodation.

110. Northside's conduct was willful and wanton.

111. As a result of Northside's unlawful retaliatory conduct in violation of the NYCHRL, Dr. Hill suffered economic losses including lost wages, lost benefits and retirement contributions, and lost professional opportunities, for which she is entitled to back pay, front pay, and compensatory damages.

112. As a result of Northside's unlawful retaliatory conduct in violation of the NYCHRL, Dr. Hill has suffered and continues to suffer severe mental anguish and emotional distress, including depression, anxiety, humiliation, stress, loss of self-esteem and self-confidence, emotional pain and suffering, nightmares, sleep disturbance, and physical manifestations of stress.

## JURY DEMAND

113. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

114. **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant as follows:

   A. Declaring that Defendant violated the Family Medical Leave Act, New York Labor Law § 740, New York Not-for-Profit Corporation Law § 715-b, and the New York City Human Rights Law;

   B. Awarding back pay and front pay for all lost wages and benefits;

C.  Awarding compensatory damages for emotional distress, mental anguish, physical manifestations of stress, pain and suffering, and injury to professional reputation;

D.  Awarding punitive damages for Defendant's willful, wanton, and malicious conduct;

E.  Awarding pre-judgment and post-judgment interest at the legal rate;

F.  Awarding attorneys' fees, costs, and expenses as provided by statute;

G.  Reinstating Plaintiff to her former position, or in the alternative, awarding front pay in lieu of reinstatement; and

H.  Granting such other and further relief as the Court deems just, equitable, and proper.

Dated: March 30, 2026
Bellport, NY

**MESIDOR PLLC**

By: _Marjorie Mesidor_
Marjorie Mesidor
Joseph Myers
Katlyn Palmatier
30 Station Road, Suite 5
Bellport, NY 11713
Telephone: (212) 930-6010
mm@marjoriemesidor.com
jm@marjoriemesidor.com
kp@marjoriemesidor.com

*Attorneys for Plaintiff*